CENTRAL SURETY & INS. CORPORA-
TION v. McCOWAN.

No. 4947.

Court of Civil Appeals of Texas.
Texarkana.

March 18, 1936.

Rehearing Denied March 26, 1936.

E. C. Gaines, of Austin, King, Mahaffey & Wheeler, of Texarkana, Tex., and James D. Head, of Texarkana, Ark., for appellant.

Wm. V. Brown, of Texarkana, Tex., for appellee.

HALL, Justice.

Appellee filed this suit in the district court of Bowie county October 29, 1934, to set aside a compromise settlement agreement made on April 21, 1934, between him and the agent of appellant. Appellee alleged that he was injured on January 26, 1934, while employed by W. D. Smith & Sons who carried a policy of compensation insurance with appellant; that his injuries consisted of burns to his hands, arms, and body caused by exploding gasoline which totally and permanently incapacitated him. He alleged, further, that appellant paid him compensation insurance for a period of time after his injury and on April 21, 1934, a compromise settlement was entered into between appellee and agent of appellant whereby appellant agreed to pay him the sum of $75 in full settlement of his claim. This settlement agreement, appellee alleged, was procured by fraud on the part of the adjuster of appellant; that he did not know he was signing a settlement agreement and was not advised by the adjuster, or anybody else of that fact; that he thought he was signing a receipt for $75 which he understood and believed was back compensation owing to him by appellant to be used by him until he got well. This compromise settlement agreement, sought to be set aside by appellee, was submitted to the Industrial Accident Board of Texas and was by said board approved on May 14, 1934. The appellant answered by general demurrer, general denial, and also set up the compromise settlement agreement which had been executed by appellee on April 21, 1934, and the approval of the same by the Industrial Accident Board.

The case was tried to a jury on special issues which were answered favorably to appellee, and judgment was by the trial court entered accordingly. From this judgment the appellant prosecutes its appeal to this court.

By appellant's first proposition under assignment of error No. 4, the contention is made that, "Where, at the time a compensation settlement agreement is made it is represented and intended for the claimant to understand that if the amount then paid did not cover his disability the case will be reopened and he will be paid further compensation in the event he should not improve or become worse, then the execution of the contract was not induced by fraud." At the instance of appellant, the court submitted to the jury the following special issue: "Do you find that at the time the compromise settlement was made, the Agent and Attorney of defendant, James D. Head, intended and led the said Charlie McCowan to understand that if the amount then paid did not cover his disability, he would re-open said matter and pay the said Charlie McCowan further compensation if the said McCowan did not improve or should become worse?" To this special issue the jury answered, "Yes," and upon the answer to same appellant requested a judgment in the lower court, which was refused, and a reversal here of the judgment of the lower court. In the light of the evidence and pleadings, we cannot agree with this contention advanced by the appellant. There are no pleadings upon which this special issue could be based, and the evidence is lacking entirely in this respect. The testimony of the adjuster, Head, with regard to the compensation settlement agreement, is:

474

"Q. I will ask you now to tell the jury the history of your negotiations in entering into that settlement with him and what took place at the time. A. Well, the negro was brought into my office at my request for the purpose of making a final settlement and adjustment of any claim he might have. He was brought in there by Mr. W. D. Smith and his son, and I questioned the negro very carefully and advised him that I wanted to know his present status, and the negro gave the statement and I took it down, and put them into the affidavit that was made on that day by Charles McCawnd, Perry Smith and W. D. Smith. Up to that time I had very little knowledge of the nature of the case. I had just been requested to get up the necessary papers, so all this information contained in the attached affidavit and a good deal of that contained in the compromise settlement agreement was obtained by questioning Charles McCawnd, and also by conferring with W. D., and Perry Smith, the son of W. D. Smith, and injured in the same accident. I explained to him fully what we were there for,—that the company wanted to settle up now, that we had a report to the effect the negro would be able to go back to work fully within two or three weeks. That was April 21, and he would be able to go back to work on May 15, from the doctors. I asked him at the time was he able to work temporarily, and he said he was, that he would not be able to work steady but could work part time, and I also questioned Mr. Smith with reference to that. And those statements contained in the compromise settlement and agreement were obtained there in that manner. Of course, I only knew with reference to the negro's ability to work what he told me and what the doctors said about it, and they all thought, the negro and Mr. Smith and his boy and his doctors, that he would be fully able to go back on his job on the 15th of May. I explained to him fully if he made this compromise settlement that was the end of the money he would get from this insurance corporation; and, in that connection, when he first came in there I suggested to him, after we had gone over the situation, that he probably might be able to go to work earlier and he might not be able to go to work until May 15, and I suggested at first that we pay him $50.00 in addition to what had already been paid him. I asked him how that would suit him, and he said he didn't know, and I told him I wanted to make it satisfactory because I wanted a final settlement, and if that wasn't satisfactory, how about $75.00, and he spoke up immediately and said that would be satisfactory. Then I proceeded to draw up these papers in accordance with the agreement made. At that time the negro had thick scar tissue on his face, but if anything was wrong with his mouth it wasn't noticeable to a layman or to me at that time. I would not have known the negro when I saw him in the court room this morning unless I had known he was the plaintiff in this suit. I only recognized him because of that fact. It is swollen very much as compared with what it was then. He did have scar tissue and he complained that on one side he did have some itching, but I attributed that to his burns. He said something,—had something on his wrist that looked like cotton seed oil at the time, and he was complaining of the itching in his wrist as the place where the itching was. I think that is about all that occurred at that time in the office. I read over all these papers to him, the affidavit and compromise settlement, and he swore to the compromise settlement before Mr. Ben Carter, a lawyer in Texarkana, whose offices adjoin mine, swore to the affidavit I mean. They were all read to him and he understood fully what he was doing at the time.

"Q. Now, Mr. Head, you didn't at that time pay him the $75.00? A. No, sir. I explained to him before he could get any money this had to go to Austin to the Industrial Accident Board and they would pass on it, and if they approved the settlement we would pay it as soon as the approval was had. Now, it went back to the Industrial Accident Board,—I was advised by them that they wanted, when they learned Dr. S. A. Collum, Sr., who gave the original statement, was dead, then they wanted an examination by another physician of their own choice, and they named Dr. Good, and I notified Mr. Smith to bring the negro in to see Dr. Good."

Thus, it is seen that the burden of the evidence of adjuster, Head, was to the effect that the settlement with appellee was to be final; that he was to receive no more money from the appellant on his claim for disability. So, in our opinion, it was the duty of the trial court to disregard the answer of the jury to this special issue and to render judgment on the answers to the issues which were based on the evidence and pleadings of the parties.

Appellant cites and relies upon the case of Blow v. Indemnity Insurance Co. of North America (Tex.Civ.App.) 66 S.W.(2d) 469, in support of its contention under this assignment. We do not think this decision is in point. In that case appellant, plaintiff below, alleged that the agent of the insurance company induced him to sign the compromise settlement agreement by representing to him " 'that the insurance company would pay him additional compensation if his condition grew worse or grew no better, and that it would after the settlement was made pay him all compensation he was entitled to receive under the law and the facts of the case, and that the plaintiff was not making a full and final settlement. * * * Plaintiff alleges that the said representations and promises so made to him were false and untrue and were known to be so by the defendant and its said agent, and that the same were made to the plaintiff without any intention of carrying them out and for the purpose of procuring the settlement and release which the plaintiff executed upon payment to him of the said sum of $75.-00.' " The special issue discussed in the Blow Case, supra, was clearly authorized by the pleadings and presumably by the evidence introduced by plaintiff in support thereof. In that very material respect it differs from the case at bar, and, in our opinion, is not controlling.

■ Appellant's second proposition under assignments of error No. 2 and No. 3, asserts that the appellee wholly failed to show the existence of an insurance policy issued by appellant covering employees of Smith & Son, and failed to show that he had made claim to the Industrial Accident Board, or to show cause for such failure, and that by reason of such failure to prove these prerequisites, no judgment could be rendered. The evidence in this case is undisputed that the employer of appellee had actual notice of his injury either the day the injury occurred or the day thereafter. The record here reflects that the appellant paid to appellee several installments of compensation before the date on which the compromise settlement agreement was executed. It is undisputed that the Industrial Accident Board took cognizance of appellee's claim within six months after his injury by approving the settlement agreement sought to be set aside in this suit. Appellant in his answer alleges the compensation settlement agreement and the Industrial Accident Board's approval thereof as a defense in bar of this action. In this connection appellant in its brief makes this statement and admission: "On the 26th day of January, 1934, appellee received accidental injuries by being burned while employed by W. D. Smith & Sons who carried a Workmen's Compensation policy with Central Surety and Insurance Corporation, appellant in this case. Compensation was paid weekly for a period of time until on or about the 21st day of April, 1934, when a compromise settlement agreement was made between the parties by which appellant agreed to pay Seventy-Five ($75.00) Dollars in addition to weekly payments theretofore made. This compromise agreement was submitted to the Board on the 7th day of May, 1934, along with the medical statements supporting the same, but the Board desiring additional medical evidence sent appellee to Dr. Louis P. Good for examination and after receiving his report, entered its final order approving said compromise settlement and the said sum of Seventy-Five ($75.00) Dollars was duly paid to appellee and his receipt therefor was filed with the Board." In view of the statement above in appellant's brief and in its pleading, and the undisputed evidence that appellant had paid several installments of compensation insurance to appellee, we think it would not be necessary for appellee to prove the existence of the policy of insurance or that the appellee's claim had been placed before the Industrial Accident Board. Casualty Reciprocal Exchange v. E. O. Berry, 90 S.W.(2d) 595, decided by this Court on Dec. 5, 1935, in which writ of error was refused, and cases there cited.

■ Appellant by its third proposition under assignments of error No. 6 to No. 18, both inclusive, asserts that "where the answers of the jury to special issues are against the overwhelming weight of the testimony that reasonable minds may not differ about it, it is the duty of the trial court to set aside a verdict rendered on such issues." The appellee is a negro who is unable to read and write, except to scrawl his name. He testified that the compromise settlement agreement signed by him was not read over to him, nor was it explained to him. He stated that:

"Q. I will ask you, Charlie, if Mr. Head here, or Mr. Smith there, in your presence didn't read you that paper? A. No, sir,

they didn't. Didn't anybody read it, wasn't no reading done up there.

"Q. Didn't they read every word of the paper over to you from start to finish and tell you they had read all the paper to you before you signed it? A. No, sir.

"Q. No one did that? A. No, sir.

"Q. What did they tell you was in the paper? A. They didn't tell me nothing was in the paper, just said it was a receipt for the money.

"Q. Did they tell you if you signed that paper that was all the money you would get? A. No, sir, they didn't say that was all I could get. They gave me that to get well or better. I thought after I got well they would give me some more.

"Q. Didn't they tell you that was supposed to do you until you got well? A. Yes, sir, that was enough to do me until I got well, they said."

Throughout his testimony he reiterated the statements set out above. Backing up his contention that he would not have settled his claim for the small amount of $75 was the gruesome disfigurement of his hands, face, and arms caused by his injury. Contradicting him with reference to the executing of the compromise settlement agreement were W. D. Smith and Perry Smith, employers of appellee, and J. D. Head, agent of appellant. For some reason B. E. Carter, the notary who took appellee's affidavit to the compensation settlement agreement, did not testify. The testimony of W. D. Smith and Perry Smith and Head was to the effect that the statement and the compensation settlement agreement were read over to appellee before he signed same, but as to the contents of the agreement which was also signed and sworn to by W. D. Smith and Perry Smith, their testimony was not at all clear. There was a certain statement in the agreement with reference to the two Smiths having talked to certain physicians about the condition of the appellee, which each of them said was false, and W. D. Smith testified that he had no recollection of Carter, the notary public who took his affidavit, being in the room. Therefore, we do not think we would be justified under the facts in this case in holding that the overwhelming weight of the testimony is against the findings of the jury. It is true that the appellee, the injured party, is an ignorant negro, but we do not think he should be penalized for that fact. Twelve white jurors heard the testimony of all the witnesses in this case, saw their demeanor on the witness stand, and were inclined to the theory advanced by the appellee. They were the exclusive judges of the credibility of the witnesses, and the weight to be given to their testimony.

Finding no error in this respect, the judgment of the trial court is in all things affirmed.